1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF NEW MEXICO

3
UNITED STATES OF AMERICA,      )
4                              )
Plaintiff,      )
5                              )   NO. 25-cr-01801-JHR
vs.            )
6                              )
Komiljon Toirov,               )
7                              )
Defendant.      )
8

9

10

11
TRANSCRIPT OF PROCEEDINGS
12          APPEAL OF RELEASE ORDER HEARING
BEFORE THE HONORABLE SARAH M. DAVENPORT
13          UNITED STATES DISTRICT JUDGE
June 18, 2025
14                11:37 AM
LAS CRUCES, DONA ANA COUNTY, NEW MEXICO
15

16

17

18

19   (Proceedings recorded by machine shorthand and
transcript produced by Computer-Aided Transcription.)
20

21   REPORTED BY:    Fatima M. Sanchez, RPR, CSR, CCR #509
Federal Official Court Reporter
22              100 N. Church Street
Las Cruces, NM  88001
23              Phone: (575) 528-1446
Email: Fatima_Sanchez@nmd.uscourts.gov
24

25

```
1    Appearances of counsel:

2        For the United States:

3                UNITED STATES ATTORNEY'S OFFICE
                 District of New Mexico
4                200 N. Church St.
                 Las Cruces, NM  88001
5                BY:  GRANT GARDNER & RICHARD WILLIAMS

6
         For the Defendant:
7
                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
8                506 S. Main Street
                 Suite 400
9                Las Cruces, NM  88001
                 BY:  AMANDA SKINNER
10

11
     Also Present:
12
         Annette Nanez - Courtroom Deputy
13       Laura Garibay - PO
         Sanjar Babadjanov - Interpreter (Via Zoom)
14       Juan Ramirez - Interpreter
         Enith Valdez - Interpreter
15       Gabe Pacheco - DUSM
         Jose Chairez - USMS
16       Richard Reifenscheid - USMS

17

18

19

20

21

22

23

24

25
```

1          [On the record at 11:37 AM.]

2          THE COURT:  The Court will call

3  United States vs. Komiljon Toirov, 25-cr-1801.

4  Mr. Gardner and Mr. Williams here on behalf of the

5  United States.  Ms. Skinner is here on behalf of the

6  defendant.

7          Sir, would you just pronounce your name for me

8  so I stop messing it up?

9          THE DEFENDANT:  Komiljon Toirov.

10          THE COURT:  All right.  Mr. Toirov, did I

11  say it close?

12          THE DEFENDANT:  Correct.

13          THE COURT:  Okay.  Thank you.  All right.

14  We are here on the Government's appeal of the release

15  order in this case.  I have reviewed Judge Ritter's

16  order of release, the complaint, the Government's brief

17  in this case, the defense's response.  Additionally,

18  I've reviewed Document 4 in this case, which is Judge

19  Wormuth's memorandum opinion and order dismissing

20  Counts 2 and 3 of the complaint prior to the filing of

21  the information, and the Government's brief in the

22  miscellaneous case regarding the elements and the

23  factual basis, what's required to prove the case and

24  the defense brief in that miscellaneous case, as well.

25          Are there any other materials that the

1 Government or the defense think I should have reviewed

2 today?

3            MR. GARDNER:  No, Your Honor.

4            THE COURT:  Thank you.

5            MS. SKINNER:  No, Your Honor.

6            THE COURT:  Okay.  So I'm very familiar with

7 the detention statute.  We don't need to go through the

8 standard.  It's de novo.

9       Looking at the Government's brief, it really

10 looks like the real issue here is the weight of the

11 evidence.  Basically, when we look at the nature and

12 circumstances of the offense, the government is

13 basically saying because the defendant entered

14 illegally and has pled guilty, the nature and

15 circumstances of these remaining offenses weigh against

16 the defendant because he may sneak off and not comply;

17 is that correct?

18            MR. GARDNER:  Yes, essentially, Your Honor.

19            THE COURT:  Okay.  And then with regards to

20 the history and characteristics, I don't see anything

21 on his criminal history or any information that he

22 intended to commit any crime other than illegally

23 entering the United States; is that correct?

24            MR. GARDNER:  That is correct.  The

25 Government is not arguing dangerousness or a dangerous

 1  criminal history.

 2          THE COURT:  And you have nothing on

 3  dangerousness?

 4          MR. GARDNER:  Yes, Your Honor.

 5          THE COURT:  Okay.  So we don't need to spend

 6  any time on those, and we can spend whatever time we

 7  have today on -- the real issue here seems to be the

 8  weight of the evidence.

 9      I'm going to ask you some questions,

10  Mr. Gardner.  Are you both arguing, or is Mr. Williams

11  just here?

12          MR. GARDNER:  Your Honor, I believe I will

13  be doing most of the arguing, but I may need some

14  backup.

15          THE COURT:  Okay.  I'm certain if

16  Mr. Williams thinks we need to get something else on

17  the record, he'll let me know.  So, basically, I'm

18  going to ask some questions.  And once we get through

19  the questions, I will give you an opportunity to make

20  any argument.  But I have some questions about how we

21  go.

22      So first of all, let's just talk about the

23  Title 50 charge.  So 50 USC 797 prohibits the willful

24  violation of a defense property security regulation.

25  That's essentially what the statute prohibits.

1    MR. GARDNER:  Yes, Your Honor.

2    THE COURT:  And I'll talking about mens rea

3  in the minute.  First, can we agree that the elements

4  are that -- it is a willful violation.  But absent the

5  mens rea, can we agree that the elements are, first,

6  that the New Mexico National Defense Area is lawfully

7  regulated by defense property security -- that's

8  element one -- two, that such regulation prohibits

9  unauthorized entry; three, the defendant entered the

10  NMNDA; and four, that entry was unauthorized?  Are

11  those -- setting aside mens rea, are those the four

12  elements that the Government has to prove?

13    MR. GARDNER:  Yes, Your Honor.  That's the

14  Government's understanding.

15    THE COURT:  And Ms. Skinner, do you agree --

16  we'll save willfulness for a moment, but absence the

17  mens rea requirement, are those the four elements that

18  the Government has to prove?

19    MS. SKINNER:  Yes, Your Honor.  And we would

20  also rest on our briefing in the miscellaneous case,

21  1925, because we had alternative arguments.

22    THE COURT:  Okay.  So these are the elements

23  that are outlined in Judge -- in the way that

24  Judge Wormuth framed them in the memorandum order.  Do

25  you want to be heard on any other elements that you

1  think need to be -- just leaving willfulness out of

2  it -- any other factual elements that need to be

3  established?

4  MS. SKINNER:  No, Your Honor.  And I'm not

5  trying to be difficult, I just want to make sure that

6  we're preserving that if this case is appealed and the

7  Court of Appeals would not agree with Judge Wormuth's

8  reasoning or Your Honor's reasoning, we also presented

9  alternative arguments that we believe would support

10  dismissal.  But because this gets us where we want to

11  go for our client, we agree that this is also a basis.

12  THE COURT:  Okay.  All right.  So let's

13  talk --

14  MR. GARDNER:  And, Your Honor --

15  THE COURT:  Yes?

16  MR. GARDNER:  I apologize for interrupting.

17  THE COURT:  It's okay.

18  MR. GARDNER:  So we just wanted to -- just

19  to clarify the Government's understanding of these four

20  elements without getting into the mens rea.  I think it

21  may be slightly different than what was just announced.

22  So the Government, just to state what its

23  position is, it's best characterized in 25-cr-1867 that

24  was the case that was referenced in footnote 1.  And

25  the four elements -- I'll just put it on the record --

1   leaving the mens rea element aside, so the defendant

2   knowingly and voluntarily entered the US from Mexico

3   through an area not designated as a port of entry.  And

4   then -- so that was number one, and number two, that

5   the defendant knew that by entering the US through an

6   area not designated as a port of entry, he or she was

7   acting unlawfully.  When entering the US from Mexico in

8   an area that is not designated as a port of entry --

9           THE COURT REPORTER:  I'm sorry.  Can you

10   please slow down a little bit?

11           MR. GARDNER:  I'm sorry.  Number three, when

12   entering the US from Mexico through an area not

13   designated a port of entry, the defendant also entered

14   upon the NMNDA, the NDA; number four, that the NMNDA is

15   regulated by a defense property security regulation

16   that includes unauthorized entry upon the NMNDA, and

17   then number five, the defendant was not authorized to

18   enter the NMNDA.

19           THE COURT:  Ms. Skinner -- sorry -- since

20   Mr. Gardner just read in the Government's version of

21   what they think those elements should be, would you

22   like to read in yours?

23           MS. SKINNER:  Your Honor, I would just like

24   to make a record that we do not agree that the EWI

25   informs the mens rea at all, or any of the elements in

1    this offense, and that's because it is settled, really,

2    across circuits that an EWI is a completed offense at

3    the moment that it is done.  And we cited *United States*

4    *v. Gaspar Miguel* for that proposition.  So that would

5    be my response to the Government's elements.

6            THE COURT:  Okay.  So regardless of which

7    version of elements that I or Judge Strickland --

8    because, basically, it's the two of us hearing these

9    cases for jury trial -- were to settle on, it's some

10   version of "This land has been designated as military

11   land.  It's governed by a regulation.  And the person

12   who is charged entered without authorization."

13       Now, we may have differences on how exactly we

14   frame that, but are those essentially the elements and

15   can we not discuss those further --

16           MR. GARDNER:  Yes, Your Honor.

17           THE COURT:  -- for the purposes of this

18   detention hearing?

19           MR. GARDNER:  Yes, Your Honor.

20           THE COURT:  So for the purposes of the mens

21   rea issue and what is willfulness, the Government cited

22   to *US v. Bryan* for the proposition that "'willful' is

23   an act undertaken with a bad purpose, and that is what

24   the Government must prove:  that the defendant acted

25   with knowledge that his conduct was unlawful."

1      That's a direct quotation from *US v. Bryan*.

2  It's cited in everybody's documents, both the

3  Government's pleadings, the defense's pleadings and

4  Judge Wormuth's order.  And I accept that that is the

5  definition of "willfulness" under the Supreme Court

6  law.

7      I also accept the Supreme Court's explanation in

8  Bryan that "to prove willfulness, the Government must

9  prove knowledge of the facts that constitute the

10  offense and the knowledge that his conduct is unlawful.

11      Okay.  So I think, really, does anybody want to

12  be heard further on those two issues?

13      Ms. Skinner, your hand went up first.

14          MS. SKINNER:  Thank you, Your Honor.  I just

15  want to emphasize what you stated there, that the

16  Supreme Court's definition in Bryan includes knowledge

17  of facts that constitute the offense, and that does not

18  go to the EWI.  That goes to the 50 USC 797 charge.

19  And so that's what we would really rely on to say there

20  has to be some notice or mens rea requirement.

21          THE COURT:  Mr. Gardner, do you want to add

22  anything further?

23          MR. GARDNER:  I'll just note that the

24  Government does -- it is relying on its briefing and

25  will not alter the fundamental -- what is fundamentally

1   asserted in its briefing.  And the Government agrees

2   that that is a correct characterization of Bryan, which

3   is a case that the state government does heavily rely

4   on.

5            THE COURT:  Okay.  I want to ask some

6   factual case-specific questions about Mr. Toirov's

7   case.  So the Government's brief says that the entry

8   was on May 4th, 2025, at 11:00 o'clock PM, seven miles

9   east of the Santa Teresa Port of Entry.  I am aware

10  based on the -- oh, can he hear?  Okay.

11           I am aware that based on a number of cases that

12  have been reassigned to me in the last few days, there

13  are some situations where the Government has dismissed

14  Counts 2 and 3 because there was some question as to

15  whether or not other particular defendants actually

16  entered into this New Mexico defense area when they

17  entered the United States unlawfully.

18           So my understanding is that we know when and

19  where he entered based on sensor activation at the time

20  of entry, and that then he and a couple other people

21  were found nearby hiding in the brush.  Is that all

22  accurate?

23           MR. GARDNER:  Yes, Your Honor.

24           THE COURT:  Where, along the border,

25  is seven miles east of the Santa Teresa Port of Entry?

         MR. GARDNER:  So, Your Honor, in the
discovery that we turned over, we also turned over the
GPS coordinates of where the defendant was arrested.
And those GPS coordinates, they are approximately --
the GPS coordinates of -- that Border Patrol wrote in
their report for the arrest coordinates, it is
approximately 50 feet north of the international
boundary between the United States and Mexico.  And in
looking where those are in relation to the two nearest
non-NDA areas, it is approximately 3 miles to the east
of one of the non-NDA areas, and approximately 1.8
miles to the west of another non-NDA area.  So the
Government's -- sorry if I said that --
         THE COURT:  It's okay.  Let me just make
sure I understand.  So at the point where you have
coordinates for this sensor activation, 1.8 miles to
the west, there's a break in the NDA?
         MR. GARDNER:  1.8 miles to the east.
         THE COURT:  Okay.  1.8 miles to the east,
there's a break?
         MR. GARDNER:  Yeah, and that's the arrest
coordinate we have from Border Patrol.
         THE COURT:  Okay.  So 1.8 miles to the west
there's a break, and 3 miles east there's a break, but
where this sensor was activated it was actually

1  designated as NDA.

2            MR. GARDNER:  It is 1.8 miles to the east

3  that is non-NDA, and then approximately 3 miles to the

4  west is the non-NDA.

5            THE COURT:  Okay.  But essentially this area

6  is -- the sensor activation was in the middle of two

7  non-NDA areas, but it is, in fact -- you've

8  confirmed -- in the NDA?

9            MR. GARDNER:  We have confirmed that his

10  arrest coordinates are in the NDA.  The sensor was --

11  we would presume he probably was arrested in the NDA,

12  as well.  Yes, Your Honor.  Thank you.

13            THE COURT:  Is there a road there or a trail

14  or something?  Do you know?

15            MR. GARDNER:  In looking at the map, the

16  Government is not aware of any road or trail in that

17  area.

18            THE COURT:  Okay.  All right.  Are there

19  lights out there?

20            MR. GARDNER:  I do not know, Your Honor.

21            THE COURT:  All right.  On May 4th, where

22  was the closest sign to those arrest coordinates --

23            MR. GARDNER:  I do not know --

24            THE COURT:  -- that designated that this was

25  restricted area under the NDA?

1          MR. GARDNER:  Your Honor, the Government

2     does not have that information on hand.  The government

3     could likely find that information, but one of the

4     Government's big assertions in this case is that even

5     if the defendant was able to see a sign, he would not

6     have understood it.  And the Government will easily

7     concede that the defendant did not know that he was

8     entering upon military property for purposes of this

9     detention hearing.

10          THE COURT:  Okay.  You're saying for the

11     purposes of detention.  But is it for the purposes of

12     proving this case?

13          MR. GARDNER:  Yes, Your Honor.  And for the

14     entire case going forward.  And that's one of the

15     reasons the Government is interested in this appeal, is

16     the Government can readily -- oh, sorry.  Just one

17     moment, Your Honor.

18          [Discussion off record.]

19          MR. GARDNER:  Your Honor, I'll backtrack a

20     little bit.  I apologize.  The Government's position is

21     that we do not have that information that he knew that

22     this was an NDA.  Going forward, it may change.  We may

23     gain some discovery or other information that shows us

24     that he did know.  But as we stand here today, we have

25     no information that he knew this was an NDA.

1                THE COURT:  Okay.  And I just want to

2    confirm based on my reading of all of the briefs in

3    this case and in the miscellaneous case, it appears

4    that it's the government's position that in order to

5    prove the case, which is an important factor for me to

6    consider when I'm looking at the weight of the

7    evidence, it's the Government's position that the

8    defendant does not need to know that he entered any

9    land that's characterized as military area; is that

10   correct?

11               MR. GARDNER:  That is absolutely correct,

12   Your Honor.

13               THE DEFENDANT:  [Speaking Uzbek.]

14               MS. SKINNER:  Your Honor, if I could just

15   take this opportunity to ask my client not to speak

16   unless he has a question for me.  If he does have a

17   question for me, I can ask the Court for a break, and

18   we can speak privately.  But I just want him to know

19   that I don't want anything he's saying translated on

20   the record until I know what he's trying to ask, so I'm

21   asking this for his protection.

22               THE COURT:  Okay.  Thank you.

23          And, Mr. Toirov, I have a lot of questions for

24   the Government, and so I'm just focusing on them for

25   right now.

1          All right.  I'm curious how many signs are in

2    the NMNDA today.

3              MR. GARDNER:  One moment, Your Honor.

4          [Discussion off record.]

5              MR. GARDNER:  Our best estimate today is

6    approximately 1,500.

7              THE COURT:  Approximately 1,500?

8              MR. GARDNER:  Yes, ma'am.

9              THE COURT:  And so, understanding that there

10   are breaks, approximately how large is the NMNDA?  I

11   think I saw somewhere it's somewhere between 160 and

12   180 miles long.  I think I've seen that number in

13   multiple places.  Do you know?

14             MR. GARDNER:  Yes, Your Honor.  And I

15   believe it is in the Government's brief in 25-mc-19.

16   And I think it references 180 -- approximately

17   180 miles.

18             THE COURT:  Yeah, I think that is where I

19   saw the 180-mile count and then I think I saw somewhere

20   else in someone else's brief that it might be 170.  But

21   in any event, over the span of between 170 and

22   200 miles, we have about 1,500 signs?

23             MR. GARDNER:  Yes, Your Honor.

24             THE COURT:  And the Government's position is

25   that the defendant requires no notice or knowledge that

1  he's in military land in order to prove this case?

2        MR. GARDNER:  That is correct.

3        THE COURT:  Okay.  So let me make sure I

4  cite to the right place.  I think it's in the

5  Government's brief in the miscellaneous case.  I just

6  want to confirm that the Government's position -- it is

7  footnote 5 in the government's brief in 25-mc-19.  And

8  I'm just going to read it into the record, so we all

9  know what I'm reading.  "There may be some limited

10  cases where certain aliens, such as very young children

11  or those with severe mental disabilities, enter the

12  district of Mexico from Mexico outside of a port of

13  entry, but do so involuntarily or without knowledge

14  that they are entering the United States illegally.

15  Such aliens would not be guilty of a Section 797

16  offense if they did not willfully violate the military

17  regulation preventing unauthorized NMNDA entry, i.e.,

18  if they did not act within knowledge that their conduct

19  of crossing into the United States in an area not

20  designated as a port of entry was unlawful."  Citing

21  to -- I assume this is *US v. Benton*, 988 F.3d at 1238,

22  quoting Bryan.  And then it says, "Such cases, however,

23  are likely exceedingly rare."

24        That's the Government's position that if someone

25  did not know that they were unlawfully entering the

1   United States, they couldn't willfully violate these

2   defense regulations; is that correct?

3               MR. GARDNER:  Yes, Your Honor.

4               THE COURT:  Okay.  And, in fact,

5   Mr. Gardner, you wouldn't charge them with illegally

6   entering the United States if someone didn't intend to

7   cross the border unlawfully and then did so; is that

8   correct?

9               MR. GARDNER:  That is most likely correct.

10  We didn't brief that issue, but I'm also certain that

11  would be the result, as well, yes.

12              THE COURT:  Do you want to consult with the

13  criminal chief?

14              MR. GARDNER:  One moment, Your Honor.

15          [Discussion off record.]

16              MR. GARDNER:  Your Honor, I think the

17  Government -- the Government will just state that it is

18  resting on its -- the position it set forth in its

19  brief.  And I -- I don't think I have any further

20  comments on that point.

21              THE COURT:  Okay.  I'm not trying to get

22  into your prosecutorial discretion in charging the EWI.

23  I just -- I think it is important to note that knowing

24  that you are coming across the border unlawfully and

25  intending to do so is an important element of the 8 USC

1  1325 charge and that you charge that all the time based

2  on people knowing that they're crossing the border and

3  intending to do so.

4          MR. GARDNER:  Yes, Your Honor.  The

5  Government does concede there has to be some sort of

6  voluntary and knowing element as to that 1325 charge.

7          THE COURT:  Okay.  And there is no -- well,

8  let's just go back to these questions.

9          Okay.  So my understanding of the Government's

10  position is simply knowing that you're crossing into

11  the United States, if you happen to cross into an area

12  that's been designated as a defense area, just because

13  you knew and entered unlawfully, that's sufficient to

14  prove willfulness for the purpose of being guilty of

15  the Title 50 trespassing charge and the Title 18

16  trespassing charge; is that correct?

17          MR. GARDNER:  Yes, essentially.  As long as

18  the defendant knew that what he was doing was unlawful.

19  He does not need to know why it was unlawful, but, yes,

20  he does not need to know that that was military

21  property.  He just needs to know that he was not

22  permitted to cross this boundary.

23          THE COURT:  Okay.  So there's nothing else

24  required is the Government's position, and that then

25  basically piggybacks on a class A misdemeanor to a

1  class B petty offense.

2         MR. GARDNER:  Yes, Your Honor.  There is no

3  additional mens element requirement that the defense,

4  obviously, has been suggesting.  The Government's

5  position is that, indeed, the defendant -- that, as

6  mentioned, he does not need to know that this was

7  military property.  And if it is military property,

8  even though he had no idea that it was, yes, he is

9  guilty of these two additional offenses that deal with

10  military property.

11         THE COURT:  Okay.  All right.  So

12  essentially, you're tacking on -- you're doubling the

13  penalty exposure for someone to enter into this

14  military area.

15         Now, the Government concedes that they

16  wouldn't -- that someone has to know that they are

17  unlawfully entering into the United States.  I don't

18  know if anybody has put on the record, nor do I know

19  that it's relevant, where the actual border is when

20  someone crosses.  I think that there are areas where

21  the border fence is at the -- has been erected within

22  the boundary, and so someone may actually cross the

23  international boundary before they cross the fence.

24         And so in just doing that, they have -- but they

25  know -- wherever the line is, they know that they're

1   coming into the United States.  That's the whole reason

2   that they're coming down at the southern border is to

3   get into the United States.  Does anybody dispute that

4   that is the point of the actions taken by people who

5   are charged and convicted of illegal entry?

6           MR. GARDNER:  The Government agrees that is

7   the motivation that the Government sees in this case

8   and in hundreds of other cases is to come here

9   unlawfully.

10           THE COURT:  Right.  And so wherever the

11   boundary is, wherever there's a fence that they go over

12   or they go under or they cut a hole in or it's not

13   there and they just, at some point, cross an invisible

14   line, they intend to come into the United States and

15   they do so whenever they cross the line, and then

16   they're charged with that when they're found having

17   just entered, correct?

18           MR. GARDNER:  Yes, Your Honor.

19           THE COURT:  All right.  So I do not

20   understand the Government's argument that they do --

21   I'm not saying that they need to -- that you have to

22   prove that they knew about -- that a regulation

23   existed, that it was, in fact, named anything

24   particular or anything else, but I am having a real

25   hard time understanding how the Government can argue

1   that someone does not have to know the nature, the

2   character of the land they're entering is military land

3   to be subject to increased penalties, to be entitled to

4   a jury trial, a district judge on a class A

5   misdemeanor, and twice the penalty that they would face

6   just for coming into the United States unlawfully.  I

7   am having a real hard time squaring that they're -- I'm

8   not saying they have to state it's a New Mexico

9   National Defense Area designated on whatever date it

10  was actually designated earlier this year, or that

11  it's, you know, transferred land from the 1907

12  Roosevelt Reservation.  I'm not saying they need any

13  understanding of that.  I'm not saying that I don't

14  understand why you don't have to prove that they knew

15  of a specific regulation.  But I am having a real hard

16  time understanding how the Government argues that they

17  don't have to know that it's at least military land

18  when you have spent gobs of man-hours and resources

19  putting up 1,500 signs -- which, frankly, I've seen the

20  picture of it in your brief.  It is, you know, verbose

21  to the point of dysfunction.  It is absurd that anybody

22  would know what that says.

23          Now, if a tank is sitting there, I think

24  somebody knows.  But I don't understand why the

25  Government would spend that kind of time and money to

1  put up these signs if it does not believe that notice

2  of the nature and character of that land is important.

3  And nobody puts up signs without somebody deciding that

4  notice is important.

5       And so it's really difficult for the Court to

6  square how it is that you've done all that work, and

7  now it doesn't matter at all whether or not somebody

8  sees the sign or reads the sign or understands the

9  sign, or even if they don't read or understand the sign

10 that they can appreciate that the sign means they're

11 entering a more particularly restricted area than just

12 coming into the United States unlawfully.  So that

13 is -- I am really struggling with that particular

14 aspect of the weight of the evidence of your case.

15       So I'm going to let you respond, and then I will

16 let Ms. Skinner add anything that she may have on that.

17            MR. GARDNER:  Yes, Your Honor.  Thank you.

18 So there are two -- I'll break this up into two

19 sections.  There's a 797 charge, 50 USC 797, which adds

20 on this additional year of penalty that the Court has

21 been referencing, and also the 1382 charge, which is in

22 addition -- which adds on -- tacks on six months.

23       With the 797 charge, the statute does state that

24 the signs do need to be placed in conspicuous and

25 appropriate areas.  And so the Government -- you know,

1  what does that mean in the context of an 180-mile

2  border?  The Government's position is that doesn't

3  translate into that the defendant has to know that the

4  sign was there, that he has to know that it was

5  military property.  The Government's position is that

6  the signs -- given the -- just the sheer length of the

7  border, the terrain, that these are conspicuously and

8  appropriately placed.

9       With regards to willfulness, and that is really

10  the heart of this dispute -- you know, it does say that

11  the defendant has to willfully violate a defense

12  property security regulation.  So how does somebody

13  willfully violate a regulation he knows nothing about

14  or when he doesn't know that this land is NDA land?

15       The Government, you know, again, it's relying on

16  its written briefs.  But essentially what a lot of that

17  gets at is the Bryan case, I believe, from 1998, from

18  the Supreme Court, where it discusses "willfully" and

19  what the definition of "willful" is.  And the

20  Government is essentially relying on that definition of

21  "willfulness" to essentially say that -- which

22  essentially says that ignorance of the law is no

23  excuse.  And that's the general default rule.

24       There may be some rare exceptions.  And the

25  Bryan case discusses that where there are, you know,

1   very particular tax regulations that you need to

2   actually know what that regulation is to violate the

3   law.  This is not one of those cases under the Bryan

4   case.  The Bryan is case is essentially saying if you

5   know -- understand what your conduct is and that it's

6   unlawful -- and the Government's position is that, yes,

7   you understood that crossing into the United States was

8   not allowed -- that that's is sufficient for

9   willfulness.

10          And so, yeah, essentially, I think that's what a

11   lot of this dispute boils down to is -- with the 797

12   charge, with the Government and the defense and a lot

13   of this litigation.

14          With a 1382 charge, there is no reference to

15   willfulness.  It simply says that -- you know, if you

16   enter upon military property for an unlawful purpose.

17   And the Government's position is you didn't need to

18   know that was military property; you just had to have

19   an unlawful purpose for entering that property.  The

20   government's position is you clearly had an unlawful

21   purpose.  You entered on that land for the purpose of

22   illegal entry into the United States.

23          So the analysis -- it may be a little bit

24   quicker than the 1382 context.  That's essentially, I

25   think, the Government's explanation at this point.

                    THE INTERPRETER:  Sorry.  Interpreter

speaking.  I can barely hear counsel.  Can you please

speak into the microphone.  Thank you.

                    MR. GARDNER:  Yes.  My apologies.

         I was just saying that's essentially the

Government's position.  And the Government is happy to

answer any further questions of the Court.

                    THE COURT:  Okay.  So with regards to the

Title 18 charge, that trespassing charge, the

Government is required to have notices conspicuous, and

it's the Government's position that today, there's

1,500 signs out there, and those are conspicuous.  But

you haven't given me any evidence about where the signs

were and whether or not it was conspicuous and -- what

was the other phrase?  I don't have it --

                    MR. GARDNER:  Yes, Your Honor.  Conspicuous

and appropriate.  And that's for the -- I believe, the

Title 50 charge, 50 USC 797.  But that is a

requirement, and we have not submitted that in our

briefing, the specifics of where the signs were on the

date the defendant was caught.

         If the Court so desires, we can track down that

information for the Court, but we do not have that with

us today.

                    THE COURT:  Okay.  I think that's going to

be significant evidence that will need to be presented

if this case proceeds to trial, how you prove that he

had any knowledge.  But okay.

MR. GARDNER:  Yes, Your Honor.  And the

Government's position is not that -- that is not an

element of the offense.  It's a requirement put forth

in the statute that -- the Government does cite some

case law, I believe, in the 25-mc-19 briefing that that

is not an element of the offense.  But the Government

is happy to provide that information.

THE COURT:  Ms. Skinner?

MS. SKINNER:  Yes.  Thank you, Your Honor.

I just have a few things I want -- what would you like

me to limit my comments to right now?  I'm sorry.

THE COURT:  Well, my trouble is with this

idea that, you know, they're required to put up notice

that is conspicuous and appropriate for the purposes of

the regulation, but then they're not required -- that

somehow there's this chasm of knowledge requirement or

notice requirement or even constructive notice

requirement for defendants coming in to know the

character of the land that they're on.  That's my --

that's the crux of the issues that I'm having with the

weight of this evidence.

So that's what Mr. Gardner was addressing, and

1    I'll hear anything you want to say on that.

2              MS. SKINNER:  Okay.  Thank you, Your Honor.

3    We agree with the Court that at bare minimum, the

4    Government needs to prove beyond a reasonable doubt

5    that the defendant knew the land in question was

6    military land.

7              I think the Court's questions about signage are

8    well taken.  And because we're in a bond appeal

9    hearing, I think I have some leeway to reference

10   information.

11             And I would note that as an officer of the

12   court, I attended a field trip, essentially, to the

13   border with several of my colleagues.  We were met by

14   two Assistant United States Attorneys.  And Border

15   Patrol agents accompanied us to the area in question

16   approximately one week after these charges started on

17   April 28th.

18             With respect to the signs that we saw, they were

19   along the area that is adjacent to the large metal

20   border wall fence, and it's very -- I would like to

21   note, and I don't think the Government will dispute

22   this, that the signs are placed in an area that you

23   reach after you have gone through and exited the

24   alleged military land.

25             So if the wall is to your left, we all know and

Border Patrol agents said on our tour that there is a

buffer zone on what looks like the Mexico side of the

wall anywhere from three to six feet, because the

United States is not allowed to stand on Mexico's land

to build a wall.

I think all of us also know that there are

gates, and I personally observed large gates in the

metal wall. And those are there for wall maintenance.

You can open them on our side and get there to conduct

wall maintenance. And it appeared to me that the signs

that were placed on the United States side of the wall

were at least 60 feet from the wall.

And so if the Government's position is that the

NMNDA is a 60-foot strip, I believe that the sign

placement is -- after you have unknowingly gone through

the military area and you reach the sign, you've

already exited the area and you are now warned not to

enter what is New Mexico land. It's not the military

area.

I would note that every single sign we observed

did not have a similar sign on the back side. So if

you are coming from New Mexico towards the wall, you

would enter the area. That concerns me for our

community members who are ranchers or hikers, but

that's not relevant necessarily today.

1      And I would note that every sign that we have

2  been -- that has been given to us in disclosures that

3  I'm aware of does not show a back side of that sign.

4  So I think that this record shows that the Government

5  put a lot of effort and money and manpower into putting

6  up signs that don't warn our own citizens and that

7  don't give any degree of notice to individuals that may

8  be coming from Mexico into the United States.

9      I also want to note -- if I could just respond

10  to Your Honor's comments about the EWI at this time,

11  because I think it's somewhat relevant for my client,

12  for Mr. Toirov, who is here today and the subject of

13  this bond appeal.  First, we would, you know, dispute

14  whether the Government even has any witnesses -- I

15  think they've already hinted at this -- any witnesses

16  that could establish the land areas that are displayed

17  on these maps.  I'd note we haven't received any maps

18  in Mr. Toirov's case, but because of my involvement in

19  litigation of other cases, I'm aware of numerous maps

20  that the Government has given us that provide

21  conflicting areas that are or are not part of the NMNDA

22  and certainly, in my view, conflict the land areas that

23  are mentioned in the publication in the federal

24  registrar and the memos that we have received in

25  disclosure from Army personnel saying that certain

1   areas have been given.

2          So I think they have a proof issue.  Even if

3   they think they can tell you where the NMNDA is, I

4   think they have a witness issue of who is going to be

5   able to testify to this.

6          And with respect to the EWI, for Mr. Toirov

7   specifically, he does not speak English or Spanish.  He

8   speaks Uzbek, and I think there's a question -- he's

9   already pled to the EWI.  But if the Government were to

10  try to use that EWI plea in this case, I think there's

11  a real question as to whether he actually did know that

12  he even entered the United States without permission at

13  the time he was apprehended.  And I base this on the

14  criminal -- the disclosure the Government has given us,

15  including I-213.  There is nothing in that document

16  that tells me what language the agents allegedly

17  communicated with my client in.

18          I tried to use Google Translate this morning to

19  show him statements from me in Uzbek.  He could not

20  read them.  My colleague, Mr. Robinson, speaks Russian,

21  and I have personally sat in on phone calls where Mr.

22  Robinson has been able to communicate with my client in

23  Russian, but there's nothing in the government's

24  disclosure that says he was advised in Russian.  And I

25  would note that according to the I-213, my client

1    stated both of his parents were born in Mexico.

2          According to the I-213, my client --

3          THE COURT:  So, Ms. Skinner, I get that

4    there's potentially an issue with the language.  Noted.

5          I don't -- though he has pled guilty to coming

6    to the United States, I don't know -- what you're

7    telling me doesn't seem to undermine the factual basis

8    of his plea that he came to the United States, and he

9    meant to come to the United States, and he entered

10   through an area not designated as a lawful port of

11   entry.

12         MS. SKINNER:  That's fair, Your Honor.  And

13   I think the reason I'm bringing this up is so much of

14   this is relying on the Government's representation

15   about maps for strength of the case on the 797 and the

16   1382.  And I really am concerned about what they think

17   they can actually prove in this case.

18          I would note that the last thing that I want to

19   just put on the record about this -- the issue with the

20   signage is that one of the documents we did receive in

21   discovery in this case is a memo from Richard T.

22   Appelhans, Major General, USA Commanding, noting that

23   "As senior commander of US Army Fort Huachuca" -- which

24   I should note is in Arizona and is a real fort with

25   buildings and people who work there -- "I hereby

1   designate the federal lands and interest transferred to

2   the Department of Army as restricted area" -- I'm

3   leaving out some language -- "in accordance with Army

4   Regulation 190-13."

5        And I would ask to be -- for the Court to take

6   judicial notice of or consider entering into the record

7   Regulation 190-13 because it deals with notice, and it

8   specifically addresses prosecutions that could result.

9   And if I could just have a moment, there's a specific

10  portion that I want to read.

11       Section 4-26 of this document covers security

12  surveillance systems at Army bases and states, "Closed

13  circuit video recording systems, to include those with

14  an audio capability, may be employed for security

15  purposes in public places so long as notices are

16  conspicuously" -- I'm sorry.  That's not the right one.

17  I apologize.

18       I'm sorry, Your Honor.  May I have a -- may I

19  come back to this?  There's something very important to

20  this that basically says that notice needs to be posted

21  because you may have problem with prosecution if you

22  don't post it.

23            THE COURT:  Okay.  And I'm not sure if this

24  was submitted.  I don't think I have seen that

25  regulation.  Has that been attached to any of the

1  briefs filed in this case or the MC case?

2          MS. SKINNER:  No, Your Honor, but the memo I

3  read from cites it.  And so we did our own research,

4  and looked at it.  And I would ask the Court to allow

5  me to submit it as an exhibit today.

6          THE COURT:  Okay.  Well, we'll take that up

7  in a moment.

8          Is there anything else that you want to say

9  about this issue of whether or not they even have

10  notice?  Regardless of whether or not the sign is on

11  the entry side -- you know, the Mexico entry side or

12  the US exit side of the zone, however wide it is, is

13  there anything further you want to say about the

14  Government's argument that whether or not the person

15  knew is irrelevant to proving these cases?

16          MS. SKINNER:  Yes.  I think that the

17  Government's argument implicates potential double

18  jeopardy and multiplicity concerns if the law would

19  truly allow for conduct that encompasses only an EWI in

20  terms of mens rea requirements or a 1325 in terms of

21  mens rea requirements to then be bootstrapped or tacked

22  on to two separate criminal statutes increasing the

23  possible penalty by an additional 18 months.

24          THE COURT:  Okay.  And that's the Court's

25  concern.

1        So, Mr. Gardner, this is your motion, and the

2    Government wholly bears the burden of proving that

3    there are no conditions or combination of conditions

4    that can ensure Mr. Toirov's appearance at future

5    proceedings on these two pending charges.  So is there

6    anything further that you want to say?

7              MR. GARDNER:  Your Honor, I think we've

8    pretty much addressed everything.  We've gone through

9    the nature and circumstances, history and

10   characteristics, weight of the evidence.  The

11   Government, as it's already said, stands on its brief,

12   and I have nothing further to say, Your Honor.  Thank

13   you.

14             THE COURT:  Anything further to add on why

15   this particular gentleman cannot be -- will not come

16   back to court?

17             MR. GARDNER:  So, yes.  In the Government's

18   memo, it is requesting the defendant be detained as a

19   flight risk.  And the Court is required to consider

20   these three elements that we've discussed, nature and

21   circumstances, history and characteristics, which we've

22   already discussed.

23        The Government is certain that it can prove

24   beyond a reasonable doubt the elements of these two NDA

25   offenses with how the Government views the law in this

1    case.  It's obviously a dispute -- you know, it's an

2    issue that's being disputed right now, but the

3    Government is certain that it can prove that.  Should

4    the Court agree with the Government's position, then in

5    considering all these elements, the weight of the

6    evidence, these other elements we've discussed, he is a

7    flight risk.

8         There is no -- the reason he came here was to

9    remain undetected.  He came here with the purpose --

10   with the desire to remain undetected.  And should he be

11   released and have the opportunity to go into society,

12   the Government has a very real concern that he would

13   not come back to court for future proceedings, that he

14   knows that he would almost certainly be convicted of

15   this offense, in light of the weight of the evidence,

16   and that he would be subsequently deported.

17        THE COURT:  And do you have any information

18   about where he was going?

19        MR. GARDNER:  Within the US -- the I-213

20   says that he a was going -- that there were relatives

21   here.  And so we presume he was probably going to see

22   relatives.  We don't know much -- that's about all we

23   know, is that he was going to see relatives.  Where in

24   the United States, the Government doesn't know.  And

25   that's a concern.  We don't know --

                  THE COURT:  And you don't have any
information that he has criminal history?

                  MR. GARDNER:  Yes, Your Honor.  That's
correct.

                  THE COURT:  And you don't have any real
expectation that if I release him today he's going out
into the community today because he's going to be
picked up on an immigration detainer, correct?

                  MR. GARDNER:  As a practical matter, he
would be.  Yes, Your Honor.

                  THE COURT:  All right.  And so then if he
were to be released into the community, it would be
based on an immigration judge's release order, based
on -- with whatever information is available on where
he would go and how he would have to return for
immigration proceedings, as well as these proceedings?

                  MR. GARDNER:  Yes, as a practical matter,
that is most likely how he would end up in the
community.  The Government obviously is not arguing
that he wouldn't come back because we're making him
unavailable, but the Government is aware that as a
practical matter, that's -- that is how he would end up
in the community.

                  THE COURT:  And I know that your office has
no ability to tell the Department of Homeland Security

1   not to remove somebody, but the Department of Homeland

2   Security has the ability not to remove people that come

3   into its custody who it knows are pending trial.  You

4   don't need to respond.  We all understand that is the

5   lay of the hand.

6        I can't order you to tell Immigration and

7   Customs Enforcement not to remove them and have any

8   expectation that they will do it, but they do have that

9   power, where nobody in this building has that power.

10  Thank you.

11       Having considered all of the materials that we

12  referenced and the argument of the parties, in looking

13  at everything that has been submitted, I don't see that

14  the Government has presented evidence that this

15  defendant entered the -- I mean I do think that you --

16  based on the arrest data, you may have, at least by a

17  preponderance of the evidence, the information that he

18  entered into the NDA.  He was certainly found in an

19  area that's very close to a section of the NMNDA, based

20  on what you've said.  But other than that, I do not buy

21  the Government's argument that all he had to know was

22  that he was illegally crossing into the United States,

23  and therefore, because he happened to also cross into

24  an area which is sandwiched between two non-defense

25  areas that he is guilty of these -- that you can prove

that he is guilty of these other two offenses because

it doesn't matter if he knew.  I don't buy that logic.

And I don't think that the Government, in large, also

buys it either.

I understand that this is your position, but I

think that for Mr. Toirov or anybody else to be able to

be proved of violating these military -- the trespass

statute and the defense regulation statutes, they have

to at least know the character of the land they're

entering.

I'm not saying -- I am not saying -- and I

believe it's consistent with what Judge Wormuth wrote.

I'm not saying that they have to know of the

regulation.  You don't have to know the law itself, but

you have to at least know you're entering a base or a

military zone or some kind of military restricted area.

I just -- I'm not really seeing anything other

than just -- we disagree.  We think it's essentially --

it just is a tack-on to the 1325 charge.  I'm not

seeing anything else in support.

And I understand that is the Government's

position, but I am really struggling to accept that

there's no additional understanding of the nature and

characteristics of the land, is really what I'm saying.

Like I said, ignorance of the law itself is no excuse,

1   but I think that you have to -- just like you have to

2   know that you're heading into the United States and

3   that's where you intend to go, like, in order to be

4   guilty of the illegal entry offense, I think you have

5   to know that you're on some sort of military land.

6           And I think that there are ways in which the

7   Government will be able to prove that someone knew or

8   should have known.  Maybe they didn't read or

9   understand the sign, but there are going to be cases

10  where the evidence supports at least the "You knew or

11  should have known that the area you were entering into

12  was not just the United States, but it was also this

13  more heavily regulated area of military character."

14          You know, and it's not a base.  I think I was

15  calling it a base for a while.  It's not a base, I

16  don't think.  I think it's a defense area.  And I don't

17  know exactly what that is.  And I don't think anybody

18  has to require a defendant to know what that is.  I

19  don't think you have to prove that.

20          But in this case, I do not find that the

21  government has presented specific evidence that shows

22  that they can meet the element.  And I am adopting the

23  elements and requirements that are set forth in

24  Judge Wormuth's order.  So in cases that the

25  Government -- including this one, if they come before

1  me in trial and you want a brief reconsideration of

2  that, I will read whatever you have.  But just saying,

3  "Well, because we said he came in unlawfully and he

4  knew that, it's sufficient," I don't buy it.

5          And so in this case, I am finding that the

6  weight of the evidence is not strong against

7  Mr. Toirov.  And the presumption under the Bail Reform

8  Act is that someone will be released on their own

9  recognizance or on conditions that can be fashioned,

10  but I don't have any information to show that

11  conditions are necessary.  And so I'm going to affirm

12  Judge Ritter's order releasing him on his own

13  recognizance pending the resolution of these other two

14  charges.

15          You know, I would encourage the Government to

16  consult with the Department of Homeland Security and

17  see if they can find some way to keep people around for

18  trial if that's what they want to do.  I understand

19  that may be an exercise in futility.  And I also

20  understand that the Government may want to appeal this

21  to the Tenth.

22          Do you already have that approval, or do you

23  need me to stay this release order?

24          MR. GARDNER:  One moment, Your Honor.

25          [Discussion off record.]

1          MR. GARDNER:  Your Honor, if the Court --

2    the Government requests that the Court stay this --

3    stay the release until noon on Friday so that it can

4    consider whether or not to appeal.  Tomorrow is a

5    holiday, so the Court requests -- that is the

6    Government's request for the Court.

7          THE COURT:  Okay.  Ms. Skinner?

8          MS. SKINNER:  Your Honor, I would like to

9    make a somewhat lengthy record on this.

10          THE COURT:  On the stay?

11          MS. SKINNER:  Okay.

12          THE COURT:  Okay.

13          MS. SKINNER:  Your Honor, I think the

14    Government got close today to admitting that this is a

15    test case for them.  As Your Honor knows, Defense does

16    not have the luxury of choosing test cases.  Any case

17    that goes to trial in this courtroom, I will put a hand

18    to God and swear it's because the client wanted to go.

19    We can tell people as much as they want that they have

20    an incredible case for appeal.  It is up to our

21    clients.

22          The Government is in a different position, and I

23    accept what I think is their reason for wanting to push

24    this specific case.  Your Honor is aware that the only

25    other appeal that they've filed in relation to

dismissals in this case was an appeal that Your Honor

dismissed for lack of case law to support their appeal

of a failure of the magistrate to find probable cause,

also against an Uzbek speaker.

While I understand that this allows them to get

the issue that they want addressed, which is mens rea

or notice, up to the Tenth Circuit, I think the

Government is also bound by equal protection concerns,

due process concerns, and ethical concerns.

My client, as we noted in our motion -- or our

response to the Government, is essentially in solitary

confinement because he cannot even have a basic human

interaction with anyone at the facility.  I don't

typically share client communication, but in this case,

I think it's important.

I have notes in front of me that I took during a

recent phone call where my colleague, Mr. Robinson,

spoke with our client in Russian.  And Mr. Toirov

stated, "One day in jail feels like a week."

Mr. Robinson and I were moved by his

descriptions of how isolated he is, and we promised him

that we would file our briefing in this case early

because of how he is suffering in custody.  We also

told him we would agree to waive a hearing, though I

understand why Your Honor went through with the hearing

1   in this case.

2          Mr. Toirov told us that he is worrying all the

3   time.  He's desperate for opportunities to communicate

4   and his enthusiasm when Darren -- when Mr. Robinson

5   gets on the phone is palpable.

6          At the end of the call, he said, "Please call me

7   next week.  Please call me."  And Mr. Robinson called

8   him as often as he could just to have a conversation

9   about how he was, about his home and his home country

10  and about his concerns about his family.

11         This morning, I had the opportunity to speak

12  with my client with the Uzbek interpreter on the phone.

13  As an officer of the court, I called the interpreter at

14  10:33 AM, and I was upstairs because I wasn't sure

15  where to go.  And that's on me.  I should have reached

16  out earlier to find out where to go.

17         I spoke to colleagues who said, "Go to the

18  Marshal lockup.  He should be waiting for you there."

19         I went down to the Marshal lockup and spoke

20  face-to-face to a Marshal who I don't know.  I haven't

21  been around the courthouse recently, and I don't know

22  who it was, but I could pick him out of a lineup.  And

23  he came in while I was waiting in booth 1 and told me,

24  "Your client is next upstairs."

25         I knew he wasn't next because I had just been up

1     here and seen all of the people waiting.  So I e-mailed

2     Your Honor's CRD and Mr. Gardner and said I was

3     downstairs and wanted to speak to my client.  I was

4     informed that we probably had about 15 minutes before

5     this case was called.  Turns out it was closer to 40,

6     so I wish I would have stayed down there.

7            And when the Marshal came in, he said, "Your

8     client is already upstairs, and he's next."

9            And I told him, "No, I don't think he is.  And I

10    want to speak with him before the hearing.  Can you

11    please bring him down?"

12           And the Marshal responded in a way that I

13    thought my client was going to be brought down.  No one

14    ever came.  No one updated me on whether they were

15    refusing my request.

16           So I came up here 12 minutes after I received

17    the e-mail from your Court staff telling me that I had

18    about 15 minutes, because I did not want to make the

19    Court wait, and I saw my client sitting alone on the

20    pew.

21           I don't know if the Marshals just felt like it

22    wasn't important, but I should have had an opportunity

23    to speak with my client, introduce myself in person and

24    give him some human interaction, because if the Court

25    grants the stay, it's going to be a long time before he

1    gets to speak to another human being again.

2           And, again, I understand the Government's

3    motivation, and I can't stop them from picking test

4    cases, but in this situation, I think it implicates

5    other concerns that could support this Court

6    determining that there is not a stay.

7           I don't have -- I have not staffed this with our

8    chief of appeals, but I will -- if the Court grants a

9    stay, I will discuss with our chief of appeals whether

10   it makes sense for us to agree that even if Mr. Toirov

11   is removed, this is an issue that is capable of

12   repeating itself.  And so perhaps, even if moot, we

13   should agree that this goes to the Tenth Circuit

14   because I don't think anyone should be afraid of the

15   outcome of judges determining what our laws say.  Win,

16   lose or draw, I'm respecting the rulings of this Court.

17   And, typically, I'm always losing.

18          So as I said, I can't make a for sure, you know,

19   promise on the record, but I will staff with our chief

20   of appeals whether we should agree to an appeal even if

21   Mr. Toirov is gone.  But under these circumstances,

22   Your Honor, he's been in custody now weeks past his

23   plea, and I think it's clear from the Government's

24   argument the only reason his case is being pushed is

25   because he doesn't speak English or Spanish.

1          THE COURT:  Ms. Skinner, I know with our

2   defendants who are from some of the further south

3   countries like Honduras and maybe El Salvador -- I know

4   Guatemala for sure -- although I do think that the

5   removal processes and procedures for Guatemala are now

6   faster than they used to be -- but people who are taken

7   into immigration custody who are not going right back

8   to Mexico or even, you know, one of the immediate

9   countries in the northern triangle are having to wait

10  some amount of time.

11          I have no idea how long people have to wait to

12  get a plane to go back to other places.  Like I said, I

13  believe that Guatemala is actually happening a little

14  more quickly than it used to be.

15          Do you have any information on the procedures

16  for Mr. Toirov when he goes back into ICE custody and

17  what is required for him to go back to Uzbekistan?

18          MS. SKINNER:  Your point is well taken.

19  Even if he's sent into ICE custody the day after his

20  sentencing, he likely would have to wait some time.

21  But that would be in immigration custody, not the

22  criminal jail.

23          THE COURT:  Mr. Williams, I believe that for

24  you to appeal this case, you have to go to the

25  solicitor general; is that correct?  Or is there lower

1   authority that you can obtain?

2           MR. WILLIAMS:  I'm not sure in this

3   circumstance where that ultimate authority is going to

4   come from.

5           THE COURT:  Okay.  Typically, when the

6   Government is filing an appeal, it has to go to

7   somebody in DC for that approval; is that correct?

8           MR. WILLIAMS:  Correct.

9           THE COURT:  At a minimum, it has to go

10  through your appellate chief?

11          MR. WILLIAMS:  She will be involved, yes.

12          THE COURT:  But, I mean, my understanding

13  based on past appearance is that someone in DC has to

14  approve this.  And I'm noting for the record that it

15  is 12:43-ish here in New Mexico, which means it's 2:43

16  in DC.

17          And if it were not a holiday tomorrow, I would

18  probably say that this -- I would make this release

19  order effective tomorrow at noon.  Tomorrow is a

20  federal holiday.  I think Ms. Skinner's point is well

21  taken about the isolation that Mr. Toirov is in and

22  that staying it until noon on Friday just delays and

23  delays -- I mean, I take her at her word that his

24  communication with other people at this time is

25  essentially none.

1      I think there's not very many people who speak

2  his language, and I don't have any information that he

3  understands or can communicate in any of the languages

4  that are predominantly in our detention centers.

5      And so you have a right to appeal my order.  And

6  this man has sat in custody much longer than you would

7  have asked for any misdemeanor entry offense.  I mean,

8  if it weren't for these two charges, he would have been

9  sentenced to time served weeks ago and sent home or at

10  least sent back into immigration custody.  And so he's

11  sat here for this amount of time.  And part of that is

12  on me because I gave you a week to file your brief.  I

13  gave the defense a week to respond because I wanted

14  there to be whatever briefing you wanted on the record

15  and I needed a bit of time to look at it all.

16      And he's within the -- he's within the 0 to

17  6 months on the petty offenses.  But, I mean, do you

18  have any alternative to staying until some time on

19  Friday morning for your ability to actually have a

20  meaningful chance at appeal?

21      MR. WILLIAMS:  Well, I will be consulting

22  with my office as soon as I walk out of here and will

23  do everything I can to get the decision on that as

24  quickly as possible.

25      THE COURT:  And if he's removed, is your --

1  if you have an agreement from the defense that -- you

2  know, that it's not a moot appeal, do you feel like you

3  can go forward to the Tenth, assuming approvals are

4  granted?

5           MR. WILLIAMS:  So I -- I'm not an expert on

6  this area.  My understanding, though, is that a case

7  pending appeal is different than a case pending trial

8  when it comes to the ability to proceed notwithstanding

9  a defendant's removal and presence.  So that might be a

10 possibility, but I don't know particularly.

11          THE COURT:  Where is he housed?

12          DEPUTY PACHECO:  Your Honor, he's currently

13 at Hidalgo County Detention Center.

14          THE COURT:  And so I think what I'm going to

15 do -- let me just say this out loud and then we'll see

16 how we adjust it -- I want there to be -- I don't --

17 I'm not trying to deprive the Government of their

18 ability to appeal these rulings.  These are, like,

19 incredibly -- you know, voluminous charges have been

20 filed.  It's a novel charging theory.  There's no case

21 law on point in any circuit that deals with this,

22 whether it's the willfulness or the actual detention

23 arguments.  It's all intertwined.  And I'm not trying

24 to deprive them of their ability to appeal the rulings

25 that are being issued in this courthouse.

1           At the same time, I am not trying to leave

2    Mr. Toirov completely isolated from human contact.  And

3    so what I would like to do is say that -- Mr. Williams,

4    would you please respond to my chambers and Ms. Skinner

5    within -- do you think it's reasonable to say within --

6    like, by 1:30 today -- that's, like, 45 minutes -- to

7    find out who has to give the approval and whether or

8    not it's possible you could have it either by late

9    today or by first thing business time on Friday

10   morning, which would be, you know, 10:00 or

11   11:00 o'clock in DC?

12           MR. WILLIAMS:  If we could recess for a few

13   minutes, I may be able to give you that approval answer

14   now.

15           THE COURT:  Okay.  Because if you could have

16   the answer more quickly than Friday at noon, I would

17   like to have a more expedited effectiveness or

18   effective moment for my order.  So --

19           MR. WILLIAMS:  And to be clear, that's

20   finding out where the approval chain is going to go and

21   not necessarily what the answer is going to be?

22           THE COURT:  I understand.  Why don't we take

23   just a few moments and see if you can figure out who

24   has to approve it.

25           Thank you.  I'm going to sit here.  Let's be in

1   recess.  You can take a break.  I'm not going anywhere.

2   You just let me know when you're ready to go back on

3   the record.

4           MR. WILLIAMS:  Thank you.

5           [Recess taken from 12:49 PM to 1:13 PM.]

6           THE COURT:  All right.  Are we ready to go

7   back on the record?

8           MR. WILLIAMS:  We are.  Thank you.

9           THE COURT:  If I could make sure that the

10  interpreter can still hear and Mr. Toirov can still

11  hear, just because we've been off for a little bit and

12  I know they were communicating.

13          THE INTERPRETER:  Yes, Your Honor.  I just

14  checked with Mr. Toirov.  He can hear me, as well.

15          THE COURT:  All right.  Thank you.

16      Mr. Williams?

17          MR. WILLIAMS:  Your Honor, so we're going to

18  withdraw the request for a stay.

19          THE COURT:  Okay.

20          MR. WILLIAMS:  And to answer your other

21  question, it does go to solicitors general's office,

22  ultimately, for a government appeal.

23          THE INTERPRETER:  Interpreter speaking.  I'm

24  so sorry.  Can you speak into the microphone?  I cannot

25  hear you.

1          MR. WILLIAMS:  So I said we're going to

2    withdraw the request for a stay now.  The ultimate

3    decision does go to the solicitor general's office, and

4    then we will request the transcript and proceed

5    accordingly.

6          THE COURT:  Okay.  So what I would normally

7    do is just ask -- well, I would just enter an order

8    affirming.  Do you want a more well-reasoned order, or

9    are you just going to rely on the transcript?

10         MR. WILLIAMS:  I would leave that to

11   Your Honor, how you want to do that.

12         THE COURT:  Okay.

13         MR. WILLIAMS:  The other thing I would like

14   on the record, though, is part of what is informing our

15   decision here is recognizing that the defendant is

16   going to go into immigration custody, that he's not

17   going to be released from custody entirely.

18         THE COURT:  Okay.  Thank you, Mr. Williams.

19   I'm going to, then, make -- I'm just going to

20   order that he be released, and we'll get that order

21   entered immediately and have that be effective today.

22   My understanding -- and I'm just going to put

23   this on the record and then have a Marshal confirm

24   whether or not I say it correctly -- but my

25   understanding is that hopefully Mr. Toirov could be

1    picked up from Hidalgo County today to go into

2    immigration custody if they're executing the detainer,

3    which I believe exists.  And it's 1:15.

4         I do believe he has to go back to Hidalgo County

5    before he's picked up, so unless we could move him --

6    and I don't know if Mr. Reifenscheid would be inclined

7    to do that.  But if he has any personal effects, those

8    would be at Hidalgo County, correct?

9         MR. CHAIREZ:  Yes, Your Honor.  2:00 PM will

10   be fine.  He'll be transferred.

11        THE COURT:  Okay.  So, Mr. Toirov, I'm

12   ordering that -- I'm agreeing with Judge Ritter that

13   you should be released on your own recognizance pending

14   the other two counts, the military-related charges.

15        What this practically means -- what's we believe

16   will happen is you're now going to go into immigration

17   custody.  And I hope that that happens later today, so

18   that once your case is resolved, you can be on your

19   way.  I don't know how long it takes for people to be

20   removed.

21        The Department of Homeland Security could decide

22   to withhold your removal and allow you to come back to

23   court for your trial.  I don't think anybody here has

24   any real expectation that they will do that, but they

25   could.  They have that power.  And if they do that,

1  then I think that you would just sit there at the

2  immigration facility until it was time to come back to

3  court on those other two charges.

4      And I don't know what your circumstances are or

5  what immigration relief you may be seeking, but

6  hopefully, if there is any of that, you would have the

7  opportunity to seek that once you're there.

8      Is there anything else that I need to put on the

9  record for the Government?

10          MR. WILLIAMS:  No, Your Honor.  Thank you.

11          THE COURT:  Thank you.

12      Ms. Skinner, is there anything else I need to

13  put on the record for your purposes?

14          MS. SKINNER:  No, thank you.

15          THE COURT:  All right.  Mr. Toirov, I wish

16  you good luck, and I'm sorry that it was such a long

17  hearing today and that you had to wait so long for this

18  decision.

19      Whatever happens in your case, I just -- I hope

20  that you will understand that coming to the

21  United States is not a good option if you don't have

22  permission.  So whenever this is over -- I don't know

23  if I will see you again, but if I do, I'll say this

24  again:  Please find another place to be that's not the

25  United States, unless you have permission from the

1    United States to be here.

2          All right.  We'll be in recess.  Thank you

3    everyone.  Court is adjourned.

4          [The proceedings were concluded at 1:18 PM.]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4          CERTIFICATE OF OFFICIAL COURT REPORTER

5       I, Fatima M. Sanchez, RPR, CSR, CCR #509, and

6    Federal Official Court Reporter, in and for the United

7    States District Court for the District of New Mexico,

8    do hereby certify that pursuant to Section 753, Title

9    28, United States Code, that I did report in

10   stenographic shorthand to the best of my skill and

11   ability the foregoing pages 1-56 of the proceedings set

12   forth herein, that the foregoing is a true and correct

13   transcript of the stenographically recorded proceedings

14   held in the above-entitled matter and that the

15   transcript page format is in conformance with the

16   regulations of the Judicial Conference of the United

17   States.

18

19   Dated this June 20, 2025.

20

21   S/Electronically Filed
      Fatima M. Sanchez, RPR, CSR, CCR
22   Federal Official Court Reporter
      100 N. Church Street
23   Las Cruces, NM 88001
      Phone: (575) 528-1466
24   Email: Fatima_Sanchez@nmd.uscourts.gov

25